AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

2019 JUL 17  PM 12: 14

CLERK U.S. DISTRICT COURT

Central District of California ALIF.
RIVERSIDE

| FILED |
| :---: |
| CLERK, U.S. DISTRICT COURT |
| 07/17/2019 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY:    DC    DEPUTY |

United States of America

v.

Nathanael Avila,

Defendant(s)

Case No.  **ED19-0371M**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 16, 2019, in the County of San Bernardino, in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| (1) 21 U.S.C. § 841 (a)(1); (b)(1)(A) | (1) Possession with Intent to Distribute a Cocaine, |
| (2) 21 U.S.C. § 841 (a)(1); (b)(1)(A); and | (2) Heroin, and |
| (3) 21 U.S.C. § 841 (a)(1); (b)(1)(A) | (3) Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Brandon Gonzalez, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    9/17/19

_____
*Judge's signature*

City and state:  Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Peter Dahlquist/GH

**AFFIDAVIT**

I, Brandon Gonzalez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Nathanael AVILA ("AVILA") for a violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A): Possession with Intent to Distribute a Cocaine, Heroin, and Fentanyl.

2.   This affidavit is also made in support of an application for a warrant to search one (1) digital device (the "SUBJECT DEVICE"), in the custody of Homeland Security Investigations, in San Bernardino, California, as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offense"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.     I am a Special Agent ("SA") with the United States Department of Homeland Security, ("DHS") in the Homeland Security Investigations unit ("HSI"), a component of DHS's Immigration and Customs Enforcement agency.  I have been an HSI SA since October 2016.  I am currently assigned to the Narcotics Unit in the HSI Riverside Office, which is located in San Bernardino, California.

6.     In April 2017, I completed the Criminal Investigator Training Program ("CITP") at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia.  In December 2017, I completed the HSI SA Training Program.

7.     Before becoming an HSI SA, I was a United States Border Patrol Agent from 2008 until 2016.  As a Border Patrol Agent, my duties included, among other things, analyzing narcotics trafficking patterns along the southern border of the United States, apprehending drug traffickers, and interviewing narcotics smugglers.  From May 2014 to October 2016, I also served as a Task Force Officer ("TFO") for the Riverside County Sheriff's Department Special Investigations Bureau, where my duties included conducting long-term investigations into transnational drug trafficking organizations.

8.     I have participated in numerous narcotics investigations, and I have conducted or assisted in the arrests

of numerous drug traffickers.  I have also interviewed informants and suspects concerning the methods and means of drug traffickers, and I have participated in several static and mobile surveillance activities and have assisted in the execution of numerous search warrants.  From the foregoing training and experience, I am knowledgeable about the means and methods of illegal drug distribution, including the use of coded language by drug traffickers, and how digital devices are used to facilitate and conceal drug-trafficking crimes.

### III. SUMMARY OF PROBABLE CAUSE

9.   On the morning of July 16, 2019, United States Border Patrol Agents ("BPAs") stopped a Toyota Camry near the non-operational United States Border Patrol Interstate 15 ("I-15") Checkpoint in Temecula, California. AVILA was the driver and sole occupant of the Camry.  During the stop, AVILA consented to a K-9 sniff of the Camry and the K-9 alerted.

10.   During a subsequent search of the vehicle, BPAs discovered 18 bundles of narcotics that were vacuum sealed and wrapped in white masking tape.  The narcotics were found inside the front driver and passenger seats, rear seats, and an aftermarket compartment under the center console.  Ultimately, BPA seized 11.2 kilograms of cocaine, 7.6 kilograms of heroin, and 3.55 kilograms of fentanyl.

11.   In a Mirandized statement, AVILA admitted to knowingly transporting narcotics.

## IV. STATEMENT OF PROBABLE CAUSE

12.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   United States Border Patrol Observations

13.   On July 16, 2019 BPAs S. Pinones and M. Garcia were operating in a marked Border Patrol Tahoe and performing their duties in full uniform along I-15 near the Highway 395 interchange exit.

14.   BPA Pinones has 11 years experience as a BPA. BPA Garcia has 10 years experience as a BPA.  BPAs Pinones and Garcia are familiar with the appearance of vehicles and the behavior of individuals involved in smuggling undocumented aliens and contraband through and into the United States.  The BPAs have extensive highway interdiction training and experience and have intercepted multiple contraband smuggling movements along the I-15 smuggling corridors in recent months.  The BPAs have received extensive training in identifying contraband smuggling movements in transit.

15.   At approximately 9:15 a.m., the BPAs were parked on I-15 near the Highway 395 bridge in Fallbrook, California observing northbound traffic.  The BPAs observed a red Toyota Camry bearing California license plate 7YUL433 traveling in the number three lane.

16.   The BPAs observed AVILA was sitting in a rigid, upright position as he passed the agents location.  The BPAs also noticed that AVILA tapped the vehicles brakes as he passed

4

the BPAs.  There were no vehicles or obstructions in front of
AVILA's vehicle to obstruct his driving.  The BPAs elected to
follow the vehicle to make further observations and run record
checks.

17.  With AVILA's vehicle traveling in the number three
lane, the BPAs attempted to observe the vehicle and AVILA from
the number four lane.  AVILA made a lane change into the number
two lane.  The BPAs then changed lanes into the number three
lane to observe AVILA.  AVILA then made a lane change into the
number one lane.  In the BPAs training and experience, these
lane changes were unnecessary and a tactic to attempt to create
distance from the marked Border Patrol.  The BPAs have observed
this behavior in previous attempted smuggling events.

18.  BPA Garcia ran law enforcement record checks on the
Camry which revealed the following:

a.  The Camry had crossed into the United States from
Mexico through the Tecate Port of Entry that morning at 7:39
a.m. and AVILA was the driver.

b.  There are multiple individuals associated to the
Camry with DHS lookouts for narcotics and human smuggling.  In
the BPAs' training and experience, Drug Trafficking
Organizations will purchase vehicles and give them to multiple
individuals that utilize them exclusively for illicit activity.

c.  The Camry was a salvage title vehicle.  In the
BPAs' training and experience, contraband smugglers routinely
purchase salvage title vehicles as one of their tactics as it

allows them to purchase vehicles that are intended to be used for smuggling contraband at a considerably cheaper price.

19.   While running record checks, the BPAs observed AVILA looking into his rear view mirror and noticed the Camry began swerving in its lane and the roadway median.

20.   The Agents found this behavior suspicious because they believed AVILA was so fixated on the marked Border Patrol vehicle that he was unintentionally swerving.

21.   Based on their observations and the information they had received from records checks, paired with their training and experience, the BPAs believed AVILA was involved in illegal smuggling activities.

22.   BPA Pinones activated the Border Patrol vehicles emergency equipment to conduct a vehicle stop.   The vehicle yielded north of the non-operational United States Border Patrol I-15 checkpoint in Temecula, California.

**B.   Roadside Interview of AVILA**

23.   BPA Garcia approached the Camry from the passenger side window and identified himself as a BPA.   BPA Garcia requested AVILA's identification and asked him to exit the Camry.   AVILA stated he did not have a driver's license and exited the Camry.

24.   BPA Garcia requested to see the vehicle's registration.   As AVILA extended his arm with the registration, Agent Garcia observed AVILA's arm shaking in an uncontrollable manner.   In BPA Garcia's training and experience, this is a

nervous behavior exhibited by individuals involved in illicit activity when encountered by law enforcement.

25.   AVILA stated he was coming from Tecate, Mexico and going to Paramount, California to his job in roofing.  BPA Garcia believed it was odd that AVILA would be utilizing the I-15 freeway as opposed to utilizing the I-5 freeway, which would be a more direct route from Tecate to Paramount.

26.   BPA Garcia asked what time AVILA was supposed to be at work.  AVILA stated he, "did not have a set time to show up." AVILA later stated he was not actually going to work, but was traveling to look at a potential job.

27.   BPA Garcia asked AVILA if he knew the exact address of the job site he was going to and AVILA stated that he did not know the exact address and that he was following the GPS system and will then call someone.

28.   BPA Garcia found AVILA's travel itinerary to have multiple inconsistencies and observed AVILA speak in broken statements and a stuttering voice.

29.   BPA Garcia asked AVILA if he was responsible for everything inside of the Camry.  BPA Garcia observed AVILA's behavior and noticed that he appeared to look disoriented after BPA Garcia's question.  AVILA responded "Yes, but I need to sit down and get away from the sun."

30.   BPAs Garcia and Pinnones have observed this behavior in the past, and in their experience, it is a nervous reaction individuals involved in contraband smuggling exhibit when in the presence of Border Patrol.

31.  Based on AVILA's inconsistent travel itinerary and nervous behavior, the agents asked AVILA for consent to perform a canine sniff of the Camry.  AVILA consented saying, "It's fine, go ahead."

32.  At approximately 9:40 a.m., BPA B. Bano arrived on scene with his canine partner Boris-F.  BPA Bano and canine Boris-F are trained and certified in the detection of concealed humans and the odors of marijuana and its derivatives, cocaine and its derivatives, heroin and its derivatives, methamphetamines and its derivatives, and ecstasy.

33.  BPA Bano and Canine Boris-F conducted a sniff of the Camry.  Resulting in the following:

    a.  Canine Boris continued to alert toward the rear driver's side door. Boris traced the alert back to the driver's side door and indicated with a pin point stare toward the open driver's side window.

    b.  BPA Bano continued the sniff and opened the driver's side rear door.  Canine Boris traced the alert into the vehicle and immediately indicated at the rear driver's side seat.

34.  BPA Bano informed the Agents and AVILA of the alert. The BPAs moved the vehicle to the I-15 checkpoint in order to conduct a safe and thorough search of the vehicle.

35.  BPA Pinones conducted a search on the rear seat of the Camry.  BPA Pinones removed the back covering to the seats and discovered a metal cut out that appeared to be a non-factory metal compartment built into the seats.

36.   BPA Pinnones utilized a probe with a sharp tip to probe through the back seat.  When BPA Pinnones removed the probe he observed a white powder on the sharp end.

37.   Agent Pinones tested the powder on the end of the probe utilizing a Nark Kit JR test kit, resulting in the positive characteristics of cocaine.

38.   The BPAs conducted a further search of the vehicle and discovered vacuum sealed bundles wrapped in white masking tape in the front driver and passenger seats, rear passenger seats, and an aftermarket compartment under the vehicles center console.

39.   In total, 18 bundles were removed from the vehicle and taken into custody by Agent Garcia.

40.   At approximately 9:50 a.m., AVILA was placed under arrest and transported to the Murrieta Border Patrol station for processing.

41.   At the time of his arrest, the BPAs also seized from AVILA the SUBJECT DEVICE which the found on the front passenger seat of the Camry.

42.   At the Murrieta Border Patrol Station, BPAs Garcia and Perez weighed and tested the bundles resulting in the following:

a.   Three bundles tested positive for the characteristics of fentanyl, weighing a total of approximately 3.55 kilograms.

b.   Seven bundles tested positive for the characteristics of heroin, weighing a total of approximately 7.6 kilograms.

c.   Eight bundles tested positive for the characteristics of cocaine, weighing a total of approximately 11.20 kilograms.

C.    __Mirandized__ Interview of AVILA

43.    BPA U. Perez and I advised AVILA of his __Miranda__ Rights
at the United States Border Patrol Station in Murrieta,
California at approximately 12:18 p.m.   Initially, AVILA denied
knowing there were drugs in the Camry, but ultimately, AVILA
admitted to knowingly trafficking illegal drugs for for an
individual in Mexico, known as "Gerardo." In exchange, AVILA
stated he "Gerardo" would pay for his vehicle to be repaired.
AVILA stated that he did not know what particular drug he was
transporting.

44.    AVILA stated that he is currently working in San
Diego, California as a roofer and residing in Tecate, Mexico.
AVILA stated that a few weeks ago his vehicle was having
mechanical issues. AVILA told his friend Ricardo about his
vehicle mechanical issues, and Ricardo introduced him to
"Gerardo" or "GERA".

45.    AVILA knew of "GERA" from living in Tecate and
suspected that he was involved with narcotics trafficking. When
AVILA met "GERA," "GERA" offered him to pay for his vehicle
repairs if AVILA agreed to making a couple of trips for him.
AVILA stated he knew that those trip would involve transporting
narcotics into the United States from Mexico.

46.    AVILA stated that after agreeing to GERA's offer, his
vehicle was taken to Tijuana to a mechanic for two weeks for the
repairs to be completed.   AVILA stated he did not pay for the
repairs.

47.    On Sunday, July 14, 2019, AVILA stated GERA borrowed the Camry.  AVILA states GREA returned AVILA the Camry on July 16, 2019 at approximately 3:20 a.m.  When AVILA got in the Camry, he noticed that the driver's seat felt hard and awkward. AVILA suspected that the seats may have contained narcotics.

48.    AVILA stated that after crossing into the United States, AVILA sent "GERA" photo messages via WhatsApp to update him of his location.  AVILA stated that he was going to deliver the vehicle with the narcotics to a commercial parking lot located in Paramount, California.

49.    AVILA stated that he did not make or manufacture any of the narcotics.  AVILA also stated that he did not know the type or amount of the narcotics he was transporting.

50.    The interview was terminated at approximately 1:38pm.

51.    Due to technical difficulties with the recording equipment at the Border Patrol Station, BPA Perez and I approached AVILA at approximately 2:32 pm to confirm the above mentioned facts.  AVILA was again advised of his <u>Miranda</u> rights and confirmed that a summary of the prior interview was true and correct.  That interview concluded at 2:36 pm.

### V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

52.    Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

deliver the drugs and launder the drug proceeds.   Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.   The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.   This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.   In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.   Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

digital devices, including in the form of calendar entries and
location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

53.   As used herein, the term "digital device" includes the
SUBJECT DEVICE.

54.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel

14

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

### VII. <u>CONCLUSION</u>

    56.  For all of the reasons described above, there is probable cause to believe that Nathanael AVILA has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A

_____
Brandon Gonzalez, Special
Agent
Homeland Security
Investigations

Subscribed to and sworn before me
this 17th day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), seized on July 20, 2019 and currently maintained in the custody of Homeland Security Investigations in San Bernardino, California:

1.   Motorola Cell Phone model XT1921-2, IMEI: 352168103435276;

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances)(the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the Subject Offenses;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the Subject Offenses;

d.      Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.      Contents of any calendar or date book;

g.      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.      Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.      With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.     evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.   evidence of the times the device was used;

      vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

      vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      viii.     records of or information about Internet Protocol addresses used by the device;

      ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR THE SUBJECT DEVICE

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

v

h.   If the search determines that the SUBJECT DEVICE
is (1) itself an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies
of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT
DEVICE, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

4.   This warrant authorizes a review of electronic storage
media seized, electronically stored information,
communications, other records and information seized, copied or
disclosed pursuant to this warrant in order to locate evidence,
fruits, and instrumentalities described in this warrant.  The
review of this electronic data may be conducted by any
government personnel assisting in the investigation, who may
include, in addition to law enforcement officers and agents,
attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.